STATE OF VERMONT

ENVIRONMENTAL COURT

|  |  |
|---|---|
| | } |
| In re: Entergy Nuclear/ Vermont Yankee          } | |
| Thermal Discharge Permit Amendment | } Docket No. 89-4-06 Vtec |
| (Appeal of Connecticut River Watershed Council, | } |
| Trout Unlimited (Deerfield/Millers 349 Ch.), | } |
| and Citizens Awareness Network) | } |
| (Appeal of New England Coalition | } |
| on Nuclear Pollution) | } |
| (Cross-Appeal of Entergy Nuclear | } |
| Vermont Yankee, LLC) | } |
| | } |

Decision and Order on Pending Motions

Appellants Connecticut River Watershed Council, Trout Unlimited (Deerfield/Millers 349 Chapter), Citizens Awareness Network (Massachusetts Chapter) and New England Coalition on Nuclear Pollution, and Cross-Appellant Entergy Nuclear Vermont Yankee, LLC, appealed from a decision of the Vermont Agency of Natural Resources approving an amendment of a thermal discharge permit issued to Entergy Nuclear Vermont Yankee, LLC.

Appellants Connecticut River Watershed Council (CRWC), Trout Unlimited, and Citizens Awareness Network (CAN)[1] are represented by Patrick A. Parenteau, Esq., David K. Mears, Esq., and Justin E. Kolber, Esq.; Appellant New England Coalition on Nuclear Pollution (NECNP) is represented by Evan J. Mulholland, Esq.; Cross-Appellant-Applicant Entergy Nuclear Vermont Yankee, LLC (Entergy Nuclear) is represented by Elise N. Zoli, Esq., Barbara J. Ripley, Esq., Sarah Heaton Colcannon, Esq. and U. Gwyn Williams, Esq.; the Windham Regional Commission appeared through James Matteau and John Bennett; the Vermont Agency of Natural Resources (ANR) is represented by Catherine Gjessing, Esq. and Warren T. Coleman, Esq.; and the Water Resources Panel of the Vermont

---

[1]   For the purposes of the discussion in this decision, these three Appellant organizations may be referred to collectively as "the CRWC Appellants."

1

Natural Resources Board is represented by John H. Hasen, Esq.

Procedural Context

Entergy Nuclear owns and operates a nuclear power station in Vernon, Vermont, located on the west shore of the Connecticut River at the Vernon Pool. The facility is a boiling water reactor which began operating in 1972. A portion of the thermal output of the facility produces electricity; the remainder is removed as heat through a circulating water system that passes by a condenser. The condenser cooling water is either discharged into the Connecticut River or into the atmosphere through mechanical draft cooling towers.

Discharges from the Entergy Nuclear facility into the Connecticut River are regulated under the National Pollutant Discharge Elimination System (NPDES) program, a federal program which the State of Vermont is authorized to administer. The relationship between the requirements of the federal statute and regulations and Vermont's Water Pollution Control Act and associated regulations is at issue in this appeal.

Pursuant to the federal and state statutes, discharge permits are issued for fixed terms not to exceed five years. 33 U.S.C. §§1392(a)(3), (b)(1)(13); 10 V.S.A. §1263(d)(4). Permit applicants may continue to operate pursuant to an expired permit while the renewal proceedings are pending. United States v. Con Agra, Inc., No. CV 96-0134-S-LMB at *20 (D. Idaho 1997) (unpublished). A renewal permit is required to be analyzed and "issued following all determinations and procedures required for initial permit application." 10 V.S.A. §1263(e).

In July of 2001, the ANR issued Discharge Permit No. 3-1199 (the 2001 Discharge Permit) to then-Vermont Yankee Nuclear Power Corporation., authorizing it to discharge condenser cooling water[2] into the Connecticut River, subject to temperature-related restrictions applicable to the following two periods each year: from October 15 through May 15, and from May 16 through October 14. The restrictions in the 2001 Discharge Permit

---

[2] The permit also authorizes and regulates the discharge of service water, low-level radioactive liquid, plant heating boiler blowdown, water treatment carbon filter backwash, stormwater runoff, and demineralized trailer rinsedown water, none of which is at issue in the present permit amendment application. In addition, the permit authorizes the discharge of cooling water from four service water pumps.

applicable from mid-October through mid-May regulated the maximum temperature in the river, the rate of change of the river temperature, and the increase of temperature above ambient levels, while the restrictions applicable from mid-May through mid-October regulated the allowable increase of temperature above ambient levels, as expressed in a chart relating the allowable increase to the specific ambient levels (Part I, §6(b).

The 2001 Discharge Permit also established an Environmental Advisory Committee (EAC), comprising representatives of the Vermont, New Hampshire, and Massachusetts environmental and fisheries programs, plus the coordinator of the United States Fish and Wildlife Service's Connecticut River Anadromous Fish Program, and provided that the Vermont Yankee facility's Chemistry Manager or designee would serve as the Committee's administrative coordinator and secretary. The paragraph establishing the EAC (Part I, §11, at p. 7) stated that the EAC was "advisory in function" and required the permittee to meet with the EAC "as often as necessary, but at least annually, to review and evaluate the aquatic environmental monitoring and studies program" established in Part IV of the permit.

The 2001 Discharge Permit allowed the temperature-related restrictions to be modified during an emergency shutdown, and authorized experimental test programs with alternative thermal limits to be administered as approved by the EAC and authorized in writing by the ANR. The 2001 Discharge Permit allowed the Secretary of the ANR to "reopen and modify" the permit, after notice and opportunity for a hearing, "to incorporate more stringent effluent limitations for control of the thermal component" of the discharge, based on a determination that "open cycle operation is having an adverse effect [o]n resident or anadromous fish species in the river."

The 2001 Discharge Permit was amended shortly after its issuance to account for two existing stormwater discharge points. It was amended in 2002 due to the transfer of ownership of the Vermont Yankee facility to Entergy Nuclear. It was amended in 2003 to replace a named chemical, to add a monitoring location, and to modify the fish impingement sampling requirement (to collect samples from circulating water traveling screens) so this type of sampling is not required when temperatures are below freezing. It was amended in 2004 to allow an internal facility plumbing change to divert a certain amount of cooling water from another internal source to the service water pumps.

In February of 2003, Entergy Nuclear applied for the permit amendment that is the

3

subject of the present appeal: to increase the temperature of the Connecticut River by an additional one degree Fahrenheit (1° F), as determined at monitoring Station 3 as compared with upstream monitoring Station 7, during the entire mid-May through mid-October "summer" period. The ANR issued a Draft Amended Permit for public comment and held a public hearing in November of 2005.

On March 30, 2006 (making the amendment applicable to the then-not-yet-expired 2001 Discharge Permit), the ANR issued the 2006 Permit Amendment. It allowed the requested increase for the period from June 16 through October 14, but imposed the existing limitations of the 2001 Discharge Permit for the period from May 16 through June 15. The 2006 Permit Amendment included a new provision setting a limit on the maximum temperature in the river during the mid-June through mid-October period. Part I, §6(c), at p. 5. The 2006 Permit Amendment also included a new provision in Part IV (governing Environmental Monitoring Studies), at p. 22, requiring a new type of statistical analysis (time series trend analysis) to be performed on data already required to be collected, as part of the annual report already required to be provided by that section.

The 2006 Permit Amendment became part of the now-expired permit under which Entergy Nuclear is entitled to operate[3] until that permit is superseded by the terms of the renewal permit now being considered by the ANR. At the telephone conference scheduled in the final paragraph of this decision, the parties should be prepared to discuss the current progress of and expected timetable for the renewal permit proceedings.

Several organizations participated in the ANR decisionmaking process on the 2006 Permit Amendment and have filed appeals of the March 30, 2006 ANR decision to issue the amended permit. Entergy Nuclear also filed a cross-appeal relating to the applicability of the Vermont Water Quality Standards and to the various conditions imposed in the 2006 Permit Amendment. This Court issued a stay of the effectiveness of the 2006 Permit Amendment during the latter portion of the 2006 season; any continuation of that stay for the 2007 season would have to be the subject of a renewed motion to stay.

---

[3] The 2001 Discharge Permit, as amended, expired on March 31, 2006; Entergy Nuclear filed a renewal application which was deemed complete in September of 2005.

4

Motions Relating to Party Status

Entergy Nuclear has moved to dismiss the Citizens Awareness Network[4] and the New England Coalition on Nuclear Pollution as parties.

The Citizens Awareness Network (CAN) is a Massachusetts nonprofit corporation whose stated organizational purpose is to educate the public about the effects of nuclear power on the environment, and to promote public discourse on the effects of nuclear power. CAN reports having 404 members who live within ten miles of the thermal discharge point at issue in this appeal, and 141 members who live in communities downstream of that point. Several of these members have submitted affidavits attesting to their use and enjoyment of the Connecticut River near the Entergy Nuclear Vermont Yankee facility; they engage in boating, fishing, and other forms of recreation, both in and along the banks of the River. At least one CAN member watches birds along the banks of the Connecticut River in the Vernon Pool and Turner's Falls areas, observing osprey and eagles that nest in the area. In their affidavits, CAN members have expressed their concerns that their use and enjoyment of the Connecticut River downstream of the Entergy Nuclear facility, and its surrounding environment and wildlife, will be adversely affected by the proposed permit amendment allowing an increased thermal discharge temperature, due to its effects on fish and other aquatic biota in the Connecticut River, and on the general water quality of the River.

New England Coalition on Nuclear Pollution (NECNP) is a nonprofit educational

---

[4] Although the motion does not seek dismissal of appellants CRWC and Trout Unlimited, party status allows a party to appeal to the Supreme Court from an adverse decision of this Court. For that reason, we must proceed to address this motion despite the doctrine articulated in Watt v. Energy Action Educ. Found., 454 U.S. 151, 160 (1981) that it otherwise would not be necessary to address the standing of a party whose position is identical to that of CRWC and Trout Unlimited.

corporation whose members are concerned about the risks and effects of nuclear power on the New England natural environment and human population, that is, whose stated organizational purpose is to address the environmental impacts of nuclear power and to investigate the safety, suitability and environmental effects of nuclear power plants in New England. NECNP seeks to educate members of the public about these issues. NECNP members live in the region surrounding the Entergy Nuclear Vermont Yankee facility; some of these members boat, fish, and engage in other forms of recreation in the Connecticut River and on the river banks downstream of the Entergy Nuclear Vermont Yankee facility. Several of these members have submitted affidavits attesting to their use and enjoyment of the Connecticut River near the Entergy Nuclear Vermont Yankee facility. They allege that their use and enjoyment of the river would be adversely affected by an increase in the thermal discharge temperature limit for the facility. That is, they allege that a temperature increase in the thermal discharge from the Entergy Nuclear facility will adversely affect the flora and fauna that live in and depend upon the river, and would cause a decline in the population of American shad, Atlantic salmon, and other species that depend upon those fish, causing the members to experience a diminished river environment and making them less likely to visit the river.

Appeals of ANR decisions are governed by 10 V.S.A. §8504 and Rule 5 of the Vermont Rules for Environmental Court Proceedings. Under V.R.E.C.P. 5(d)(2), once an appellant has claimed party status as a person[5] aggrieved pursuant to 10 V.S.A. §8504(a), that appellant is accorded party status unless the Court otherwise determines on its own motion, by ruling on a motion to dismiss, or by ruling on a motion to intervene.

A person is considered to be 'aggrieved' by an ANR decision if that person alleges "an injury to a particularized interest protected by the provisions of law listed in [10 V.S.A. §8503], attributable to [the decision on appeal], that can be redressed by the environmental court[.]" 10 V.S.A. §8502(7).

To determine whether CAN and NECNP have standing as organizations, it is necessary to examine the three criteria articulated in Parker v. Town of Milton, 169 Vt. 74,

---

[5] As a threshold matter, as nonprofit corporations both CAN and NECNP qualify as "persons" under 10 V.S.A. §8502(6).

6

78 (1998). An organization has standing when "1) its members have standing individually; 2) the interests it asserts are germane to the organization's purpose; and 3) the claim and relief requested do not require the participation of individual members in the action." Id. We examine these criteria in the reverse order.

In the present case, the claim and relief requested do not require the participation of individual members of CAN and NECNP. That is, the issues in this appeal pertain to the interest of the members in the effect of the thermal discharge on the Connecticut River as those members may use or enjoy the river, and not as persons asserting a private claim for damages or nuisance. In addition, for the purposes of judicial efficiency, it is helpful to have each organization represent the interests of its individual members, rather than having a potentially large number of those individuals all participating individually. Compare 10 V.S.A. §§8502, 8504 with 24 V.S.A. §4465(4) (group must designate one person to serve as representative).

Entergy Nuclear argues that neither organization's purpose is specifically related to water quality or the protection of fish habitat, or to litigation to advance those purposes. However, the "germaneness" requirement is not that stringent. To satisfy this requirement, the members' asserted interests must simply be germane to each organization's general purposes. Parker, 169 Vt. at 78. The members' interests are not required exactly to mirror the organizational purpose. Id., Hunt v. Washington State Apple Adver. Comm'n, 432 U.S. 333, 343–44 (1977) (individual apple growers' specific economic interests were germane to state apple advertising commission's broader purpose of protecting and enhancing market for Washington apples).

The interests asserted by the members of both CAN and NECNP in this appeal are related to the effects of nuclear power plants on the local environment. These interests are germane to each organization's respective purposes, which relate to the potential environmental effects of the generation of nuclear power in New England and at this facility in particular. CAN seeks to educate communities on the prevention of pollution from the generation of power from nuclear sources and to promote an environment where the free flow of ideas and discourse on nuclear and environmental issues is encouraged. CAN was organized in 1991 specifically to address water pollution issues affecting the Connecticut River, related to another nuclear facility on a tributary of the Connecticut River nearby in

7

Massachusetts; its interest in the outcome of this adjudication, therefore, is not abstract. Parker, 169 Vt. at 78.

NECNP's stated purposes include investigating the safety, suitability, and environmental effects of nuclear power plants; educating the public as to the nature and significance of nuclear power plants in New England; organizing activities designed to inform the public and appropriate governmental agencies of the hazards and risks associated with nuclear power plants; and participating in administrative agency hearings related to the licensing or permit approval for nuclear power plants in New England. Its interest in the outcome of this adjudication also is not abstract. Id.

Finally, it is necessary to determine whether CAN and NECNP members would have standing individually to bring the present appeals. This requirement, discussed in Parker, must be analyzed in light of the statutory standing requirements contained in §8502(7), which are specific to appeals to this Court. As provided in 10 V.S.A. §§8504(a) and 8502(7), the individual members must have alleged an injury to a particularized interest protected by the provisions contained in §8503, the injury must be attributable to the decision on appeal, and the claimed injury must be capable of being redressed by this Court.

Almost by definition, the claimed injury could be redressed by this Court in this de novo appeal. 10 V.S.A. §8504(a); V.R.E.C.P. 5(g). The injury complained of by CAN and NECNP is the ANR's decision to grant the 2006 Permit Amendment, allowing an increase in the thermal discharge from the Entergy Nuclear Vermont Yankee facility. As it is this Court that is responsible under 10 V.S.A. §8504(h) to rule anew on the permit amendment application, applying the substantive standards that were applicable before the ANR, the redressability requirement of 10 V.S.A. §8502(7) is met.

With respect to the requirement of alleging injury to a particularized interest attributable to the decision on appeal, individual members of both CAN and NECNP have submitted affidavits alleging various injuries to their particular interests protected by the state water pollution control statute. CAN members allege that their fishing, boating, and birdwatching ecological activities will be adversely affected by an increase in the temperature of the thermal discharge if the permit amendment is issued. NECNP members allege that their fishing, boating, and ecological activities will be adversely affected by an

increase in temperature, citing particular concerns about two species of fish that they allege will be adversely affected: the American shad and the Atlantic salmon. These allegations are specific and are sufficient to establish the threat of injury to the individuals' particularized interests in the Connecticut River itself and in the fish, birds, and other species that live in and near the River in the vicinity of the Entergy Nuclear Vermont Yankee facility discharge point. See U.S. v. Students Challenging Regulatory Agency Procedures, 412 U.S. 669, 684-85 (1973); see also, Citizens' Comm. for Hudson Valley v. Volpe, 425 F.2d 97, 102-03 (1970).

CAN and NECNP members therefore have asserted a particularized injury that satisfies the standing requirements of the new statute under which these appeals are taken, 10 V.S.A. §8502(7). For the same reasons, CAN and NECNP have met the more general standing requirements for each organization to have standing under Parker, 169 Vt. 77–78.

Accordingly, Entergy Nuclear's Motion to Deny Party Status to CAN and NECNP is DENIED.

In addition to its motion to dismiss CAN and NECNP as parties, Entergy Nuclear filed a letter[6] with the Court requesting clarification of the party status of the ANR, the Windham Regional Commission, and the Water Resources Panel of the Vermont Natural Resources Board. None of these parties is a party-appellant. The Court addressed this request as follows in an unpublished entry order dated October 3, 2006; it is reproduced here for completeness of the present published decision regarding party status:

> The Agency of Natural Resources is entitled to party status in an appeal from an Agency decision as an affected agency under 10 V.S.A. §§8504(n)(2) and 8502(5)(F), and see §8504(l). The Windham Regional Commission is also a party by right. §§8504(n)(2) and 8502(5)(C). The Water Resources Panel of the Vermont Natural Resources Board is also entitled to party status in any

---

[6] The Court noted in its October 3, 2006 entry order on this request that there is no provision in the Vermont Rules of Civil Procedure or the Vermont Rules for Environmental Court Proceedings for parties to make requests in letters addressed to the presiding judge, and that it assists the Court staff in properly docketing and tracking such requests if the requests are made in the form of motions.

appeal. 10 V.S.A. §8504(n)(3). Only parties bringing an appeal as an appellant or a cross-appellant may establish the issues on appeal; however, all parties may file motions, present evidence, cross-examine witnesses and otherwise participate.

Motions Relating to Scope of Appeal

Entergy Nuclear has moved to dismiss or narrow certain questions in the CRWC Appellants' Statement of Questions and in NECNP's Statements of Questions. The CRWC Appellants have moved to dismiss or narrow certain questions in Entergy Nuclear's Second Revised Statement of Questions. The ANR has moved to clarify and limit the scope of the appeal as to all three Statements of Questions.

The Appellants' questions may be grouped in the following categories: whether the permit amendment complies with the requirements of the federal Clean Water Act, 33 U.S.C. § 1251 et seq., and its implementing regulations related to thermal effluent (CRWC Appellants' Questions 1, 2, 3, 4, 5, and 9; NECNP Questions 1, 2, 3, 4, and 5); whether the permit amendment complies with the Vermont Water Pollution Control Act, 10 V.S.A. § 1250 et seq. (CRWC Appellants' Questions 6, 7, 8, and 9; NECNP Questions 1 and 6); and whether ANR's permitting process followed proper procedural requirements (CRWC Appellants' Question 8).

Entergy Nuclear's questions[7] may be grouped as follows: the applicability of the Vermont Water Pollution Control Act to Entergy Nuclear's application for the permit amendment at issue (Question 3); the validity of certain conditions imposed by the ANR in its grant of the 2006 Permit Amendment (Questions 4, 5, and 6); and the nature of the Environmental Advisory Council's oversight of the monitoring program in relation to the

---

[7] Entergy Nuclear withdrew Question 2 of its Statement of Questions, relating to party status, as none of the appellants failed to participate in the proceedings before the ANR. In addition, in its Question 1, Entergy Nuclear essentially outlined its arguments to dismiss certain of the issues raised by the other parties; this question therefore will be addressed only in the context of Entergy Nuclear's motions to dismiss, rather than being analyzed separately.

10

trend analysis required by the ANR in its grant of the 2006 Permit Amendment. (Question 7).

Applicability of Vermont Water Quality Standards and Vermont Statute to this Appeal (Entergy Nuclear's Question 3; CRWC Appellants' Questions 6 and 7; and NECNP's Questions 1 and 6)

Entergy Nuclear has moved to dismiss Questions 6 and 7 (and ANR has moved to dismiss Question 7) of the CRWC Appellants' Statement of Questions, and to dismiss Question 6 of the NECNP's Statement of Questions, to eliminate the issue of whether the proposed permit amendment meets the requirements of the Vermont Water Quality Standards through the state Water Pollution Control Act. Entergy Nuclear has also moved to dismiss that portion of Question 1 of the NECNP's Statement of Questions that addresses the same issue. In addition, Entergy Nuclear has moved to dismiss and ANR has moved to narrow the CRWC Appellants' Question 9, to the extent that it poses the question of whether Entergy Nuclear can meet its burden under the "applicable" provisions of state law to demonstrate that it is entitled to the proposed permit amendment. The CRWC Appellants have moved to dismiss Question 3 of Entergy Nuclear's Statement of Questions, which similarly claims that the Vermont Water Quality Standards do not apply to this proposed permit amendment.

Under the federal Clean Water Act, the United States Environmental Protection Agency (EPA) is the default permitting authority, although the Act allows states to implement their own regulatory programs if they receive EPA approval. 33 U.S.C. § 1342(b); 40 C.F.R. 123(d); Riverkeeper, Inc. v. United States Envtl. Protection Agency, 358 F.3d 174, 200 (2nd Cir. 2004). As stated in the Clean Water Act,

> Except as expressly provided in this chapter, nothing in this chapter shall (1) preclude or deny the right of any State or political subdivision thereof or interstate agency to adopt or enforce (A) any standard or limitation respecting discharges of pollutants, or (B) any requirement respecting control or abatement of pollution; except that if an effluent limitation, or other limitation, effluent standard, prohibition, pretreatment standard, or standard of

11

performance is in effect under this chapter, such State or political subdivision or interstate agency may not adopt or enforce any effluent limitation, or other limitation, effluent standard, prohibition, pretreatment standard, or standard of performance which is less stringent than the effluent limitation, or other limitation, effluent standard, prohibition, pretreatment standard, or standard of performance under this chapter; or (2) be construed as impairing or in any manner affecting any right or jurisdiction of the States with respect to the waters (including boundary waters) of such States.

33 U.S.C. § 1370. Even in a jurisdiction (unlike Vermont) in which EPA is the NPDES permitting authority, an applicant must obtain the state's certification that the discharge will comply with the federal act. In that certification, the state "may impose additional conditions in order to ensure compliance with state law, and those conditions become conditions of the federal permit." Riverkeeper, 358 F.3d at 201 (citing 33 U.S.C. § 1341(d)).

In a jurisdiction such as Vermont in which the state is the NPDES permitting authority, the plain language of § 1370 allows the state at least the same level of authority to require compliance with its own statutory and regulatory requirements before issuing a permit, as long as those requirements are not less stringent than those required by the federal act and as long as the permit meets the requirements of the federal act. See Riverkeeper, 358 F.3d at 201 (citing 33 U.S.C. § 1370).

The Vermont Water Quality Standards were adopted pursuant to the federal Clean Water Act as well as pursuant to the Vermont Water Pollution Control Act. See In re Clyde River Hydroelectric Project, 2006 VT 11, ¶3. Thus, to the extent they are not less stringent than the requirements in the federal Clean Water Act, and do not otherwise conflict with the federal statute as applied to this proposed amendment, the Vermont Water Quality Standards do apply to the Court's consideration of the proposed amendment.

The 1973 Zener memorandum does not suggest a different result. Rather, it advises that §316(a) is available to an applicant regardless of whether the permitting authority is a state or is the federal EPA. The memorandum traces the legislative history of §316(a), showing that it requires a case-by-case analysis of alternative cooling techniques, based on the particular local conditions including the characteristics of the particular receiving waters.

The memorandum advises that neither EPA nor a state could act arbitrarily and capriciously to withhold approval of a §316(a) waiver, if the applicant presented evidence showing that it met the criteria for a waiver and such evidence were not rebutted.

Accordingly, the motions to dismiss the CRWC Appellants' Questions 6 and 7 and to dismiss NECNP's Questions 1 and 6 are DENIED. We cannot determine in the abstract whether any particular requirement of the Vermont Water Quality Standards is less or more stringent than the federal standards, or conflicts with the federal Clean Water Act; rather, that determination must be made as those standards are applied to the evidence regarding the proposal before the Court.

Conditions Imposed by the ANR in its Permit Amendment Decision (Entergy Nuclear's Questions 4, 5, and 6)

Entergy Nuclear's Questions 4, 5, and 6 relate to whether the amended permit may contain certain conditions imposed by the ANR in the 2006 Permit Amendment. One condition required reduction of the facility's thermal discharge if the temperature of the river at a certain measuring station exceeds a certain limit (Question 4); another denied the requested increase during the one-month period from mid-May through mid-June (Question 5); and the third required a time series trend analysis to be performed and submitted annually for fish species and for macroinvertebrates (Question 6). Each question as stated in Entergy Nuclear's second revised[8] statement of questions, is stated in terms of whether the respective condition is "contrary to law" because "Entergy has fully and completely met its burden . . . of establishing by a preponderance of the evidence that the alternative increased thermal discharge will meet" a certain standard.

However, even after having been given the opportunity to file a revised statement of questions in light of the fact that this matter is being considered de novo by the Court, Entergy Nuclear's revised Questions 4, 5, and 6 still reflect a misunderstanding regarding the scope of this appeal. In an appeal such as this one, the Court does not examine whether an applicant met its burden of proof in the administrative proceedings from which the appeal is taken. Rather, pursuant to V.R.E.C.P. 5(g) and 10 V.S.A. §8504(h), the Court proceeds de novo to hear all questions of law or fact, applying the substantive standards that were applicable before the ANR. Thus, what the Court will have before it at the trial in this case will be the merits of whether the requested increase in the thermal discharge should be approved, and, if so, what conditions should be imposed in connection with that approval. In connection with this task the Court has the same authority as the ANR, including to impose conditions as provided in 10 V.S.A. §1263(c), and is required to apply the same substantive standards as were applicable before the ANR.

As the amendment application is before the Court de novo in this appeal, the

---

[8] These three questions were originally each stated in terms of whether the ANR had acted arbitrarily and capriciously in imposing these conditions.

question of whether any of these conditions should be imposed by the Court is simply premature, and is a matter for the trial on the merits of the permit amendment application. On the other hand, to the extent that the questions seek to establish the potential scope of any condition the Court might consider imposing, they ask for an impermissible advisory opinion at this time. See, Hunters, Anglers, and Trappers Ass'n of Vermont v. Winooski Valley Park Dist., 2006 VT 82, ¶18.

Accordingly, by or before January 17, 2007, Entergy Nuclear may again file restatements of these three questions (either separately or as a consolidated question) in terms that are appropriate for the Court's de novo role. Otherwise, these three questions will be dismissed at the telephone conference now scheduled for January 22, 2007, and the amendment application will proceed on its merits on the other remaining questions.

Opportunity for Public Review and Comment before the ANR  (CWRC Appellants' Question 8)

Entergy Nuclear has moved to dismiss the CRWC Appellants' Question 8. This question asserts that ANR failed properly to consider public comments before issuing the permit amendment.

While in a de novo appeal it is generally not appropriate for this Court to review the inner workings of an agency or board's decision, this Court is empowered to remand jurisdiction to the agency or board in the case of procedural flaws that are so prejudicial that they prevented the parties from receiving fair consideration at the administrative level. V.R.E.C.P. 5(*i*) and its Reporter's Notes (noting that court can order remand "on its own motion in an appropriate case"); and see In re JLD Properties - WalMart St. Albans, Docket No. 132-7-05 Vtec (Vt. Envtl. Ct., September 5, 2006).

However, in its proceedings on the merits of the amendment application, this Court is only required and authorized to apply the substantive standards that applied before the ANR, V.R.E.C.P. 5(g) and 10 V.S.A. §8504(h); the statute and rules do not direct it to apply the administrative procedural requirements. Thus, the Court would only examine whether any procedural errors occurred during the notice and comment period if such errors would not be cured by the presentation of evidence de novo to the Court.

Accordingly, on or before January 17, 2007, the CRWC Appellants shall file a more definite statement of Question 8 of their Statement of Questions, specifically stating any procedural deficiency within the scope of that question that affected the CRWC Appellants and showing why such deficiency cannot be cured within the opportunities for discovery, cross-examination, and the presentation of direct and rebuttal evidence that are available in proceedings in this Court. Unless such a showing is made, the CRWC Appellants' Question 8 will be dismissed at the telephone conference now scheduled for January 22, 2007, and the amendment application will proceed on its merits on the other remaining questions.

Issues Related to Provisions Approved in the 2001 Discharge Permit or in Amendments Prior to the Present Application (CRWC Appellants' Questions 1, 2, 3, and 4; NECNP's Questions 3, 4, and 5; and Entergy Nuclear's Question 7)

Entergy Nuclear has moved to dismiss or, in the alternative, to clarify the CRWC Appellants' Questions 1, 2, 3, and 4 and NECNP's Questions 3, 4, and 5, on the basis that they represent impermissible collateral attacks on the 2001 Discharge Permit and its earlier amendments, which were not appealed. Entergy Nuclear seeks a ruling that the phrase "existing thermal effluent limitation" as used in these questions refers to limitations in the 2001 Discharge Permit (as amended prior to this application) and does not encompass challenges to the terms of that permit. Similarly, the ANR argues that the doctrine of res judicata or collateral estoppel bars this Court from considering any issues related to the prior permits, other than those related to the proposed amendment.

The 2001 Discharge Permit and its amendments (prior to the present application) were not appealed and became final. However, unlike the appeals provision for zoning matters, 24 V.S.A. §4472(d), they are not subject to a statutory limitation that provisions of a prior unappealed permit may not later be contested "either directly or indirectly." Nevertheless, the reasoning discussed in Levy v. Town of St. Albans Zoning Bd. of Adjustment, regarding the evident underlying policy behind that provision is instructive: "that there should, in fairness, come a time when [administrative decisions] become final so that a person may proceed with assurance instead of peril." 152 Vt. 139, 141–43 (1989) (internal citation omitted)

16

In any event, only those elements of the 2001 Discharge Permit that pertain to the setting of a thermal effluent limitation are appropriate to be examined in the context of determining whether the proposed amendment should be approved under §316(a). That is, the existing thermal discharge provisions or other provisions of the 2001 Discharge Permit may not themselves be made more stringent in this proceeding, as this proceeding is limited to a determination of whether the proposed thermal discharge amendment should be approved.

However, this Court has authority to consider all potential conditions that could be necessary to ensure that the increased temperature proposed in the amendment would meet and continue to meet the criteria of §316(a), if the proposed amendment were to be approved. Taking an example from the conditions imposed in ANR's 2006 Permit Amendment, the duration of the increased-temperature period could be reduced, to eliminate the month from mid-May to mid-June, even though the so-called summer period from mid-May through mid-October could not have been altered in the original 2001 Discharge Permit.

We note that this entire argument applies only to the thermal discharge amendment at issue in the present appeal; that is, the renewal permit proceedings now in progress before the ANR may consider all the elements of the facility's discharge permit under all applicable present federal and state law. Regardless of whether the present appeal results in an amended thermal discharge or not, it only affects the expired permit under which Entergy Nuclear has authority to operate, and only until any renewal permit is issued. Accordingly, pursuant to V.R.E.C.P. 2(b), in the telephone conference scheduled in the final paragraph of this decision, the parties should be prepared to discuss whether it would be more efficient for the thermal discharge issues to be litigated only once, in the context of the renewal permit.

Under §316(a), Entergy Nuclear must meet its burden in seeking a waiver of the thermal effluent limitations by one of two methods: either by making a retrospective demonstration that there has been no "prior appreciable harm" or by making a prospective demonstration that, despite the occurrence of previous harm, the desired alternate effluent limitations will assure the propagation of a balanced indigenous community of shellfish, fish and wildlife. 40 C.F.R. § 125.73; In re Dominion Energy Brayton Point, L.L.C. (formerly

17

USGEN New England, Inc.), NPDES Appeal No. 03-12 (E.A.B. Feb. 1, 2006), 12 E.A.D. ___, available on Westlaw at 2006 WL 3361084. The occurrence of previous harm is an element of this second approach, as is the demonstration that the proposed alternative limitation will nevertheless have the desired ecological result. All evidentiary issues in the proceedings will be tested against these criteria.

A motion to dismiss "should not be granted unless it appears beyond doubt that there exist no facts or circumstances that would entitle the plaintiff to relief." Lodge at Bolton Valley Condominium Ass'n v. Hamilton, 2006 VT 41, ¶4. As of this stage of the proceedings, Entergy Nuclear has not demonstrated that no evidence, facts or circumstances exist that could warrant the denial of the amendment, or could warrant the imposition of conditions on the amendment, including the conditions contested by Entergy Nuclear. Therefore, dismissal of these questions is inappropriate; rather, their resolution remains for the merits of the trial. Entergy Nuclear's motion is therefore DENIED with respect to the CRWC Appellants' Questions 1, 2, 3, and 4, and NECNP's Questions 3, 4, and 5.

In turn, the CRWC Appellants and ANR have each moved to dismiss Entergy Nuclear's Question 7, which relates to the scope of the Environmental Advisory Council's authority to oversee and monitor the Environmental Monitoring Studies that may be required by the 2001 Discharge Permit and the proposed permit amendment.

Entergy Nuclear argues that the 2006 Permit Amendment as issued by the ANR improperly vests the Environmental Advisory Council with "authority to modify the permit unilaterally;" that is, that it unlawfully delegates the ANR's statutory authority to oversee permit compliance.

First, the Environmental Advisory Council (EAC) and its role with respect to the Environmental Monitoring Studies required to be conducted by Entergy Nuclear, was established in the 2001 Discharge Permit and cannot now be collaterally attacked. That role is explicitly stated in the 2001 Discharge Permit as being advisory and consultative. Although the EAC may make recommendations to the ANR, it is the ANR under the 2001 Discharge Permit (and any amendments to it) that imposes any new requirements based on those recommendations.

18

Moreover, it appears from the terms of the 2006 Permit Amendment as issued by the ANR that no new field monitoring was required, and that all that Entergy Nuclear was required to do as a condition of that amendment was to conduct a new type of statistical analysis of the data which it already had to collect under the 2001 Discharge Permit, as amended.

More importantly, as the amendment application is before the Court de novo in this appeal, the question of whether such a condition should be imposed by the Court is simply premature, and is a matter for the trial on the merits of the permit amendment application. On the other hand, to the extent that the question seeks to establish the potential scope of any condition the Court might consider imposing, involving the Environmental Advisory Council in monitoring future compliance with any permit amendment that the Court might consider approving, it asks for an impermissible advisory opinion. See, Hunters, Anglers, and Trappers Ass'n of Vermont v. Winooski Valley Park Dist., 2006 VT 82, ¶18.

Accordingly, by or before January 17, 2007, Entergy Nuclear may again file a restatement of Question 7 in terms that are appropriate for the Court's de novo role. Otherwise, Entergy Nuclear's Question 7 will be dismissed at the telephone conference now scheduled for January 22, 2007, and the amendment application will proceed on its merits on the other remaining questions.

Whether Entergy Nuclear Will Be Able to Meet its Burden under the federal Clean Water Act and the Vermont Statute (CRWC Appellants' Question 9)

Entergy Nuclear has moved to dismiss and ANR has moved to clarify or limit the CRWC Appellants' Question 9, which poses the question of whether Entergy Nuclear can meet its burden under "all applicable substantive and procedural requirements of state and federal law" of demonstrating that it is entitled to the requested permit amendment. As to the procedural requirements of state and federal law, both motions are correct; the question should be narrowed to be limited to the applicable substantive requirements of state and federal law.

As so limited, this question asks nothing more nor less than the ultimate issue in this appeal: whether Entergy Nuclear qualifies for the permit amendment for which it has applied in this application. While it may be redundant in light of the other specific questions

in the Appellants' Statements of Questions, with the modifier "applicable" it does not exceed the scope of this proceeding and will not be dismissed.

However, Entergy Nuclear and the ANR are correct that it is difficult for the Court and the parties to determine, given the breadth of the CRWC Appellants' Question 9, which requirements of state (and federal) law they consider to be the "applicable" substantive requirements for this proceeding, beyond those already stated in the other questions in their Statement of Questions. Accordingly, on or before January 17, 2007, the CRWC Appellants shall file a more definite statement of Question 9 of their Statement of Questions, specifically stating what requirements of state and federal law are "applicable" to the proposed permit amendment, beyond those already raised by the other questions in their statement of questions. If no specific requirements are claimed to be "applicable" beyond those stated in the CRWC Appellants' other questions, the CRWC Appellants' Question 9 will be dismissed at the telephone conference now scheduled for January 22, 2007, and the amendment application will proceed on its merits on the other remaining questions.


Accordingly, based on the foregoing, it is hereby ORDERED and ADJUDGED that Cross-Appellant Entergy Nuclear Vermont Yankee's Motion to Deny Party Status to CAN and NECNP is DENIED, and the various parties' motions relating to the scope of the proceedings are ruled on as provided in each grouping of questions as discussed in this decision.

Time had been reserved in the Court's schedule for hearings on the merits of this appeal for March 13, 14, 15, 16, 20, 21, 22, 27, 28, 29, and 30, and April 3, 4, 5, and 6, although at the present time the Environmental Court's own courtroom is not available for the March 27 through 30 dates. In addition, the parties reported that, of those dates, March 13 through 16 are unavailable for Appellants' counsel and witnesses, and March 20 through 22 are unavailable for Entergy Nuclear's counsel and witnesses.

In the telephone conference scheduled for January 22, 2007 at 11:30 a.m. (see enclosed notice), the parties should be prepared to update the Court on the schedule of the renewal permit proceedings, and to discuss the relation of the issues in this proceeding to

those in the renewal permit proceedings, with respect to this Court's obligations under V.R.E.C.P. 1 and 2(b).  They should be prepared to discuss the potential for and timing of mediation, and whether hearing time in March or April should be allotted solely to the issue of whether to stay the 2006 Permit Amendment during the 2007 summer season.

Done at Berlin, Vermont, this 9th day of January, 2007.


_____

Merideth Wright
Environmental Judge